# Case No. 11,713.

## The REVENUE CUTTER NO. 1.

[Brown, Adm. 76;[1] .21 Law Rep. 281; 8 Am. Law Reg. 459: 2 West. Law Month. 235; 6 Pittsb. Leg. J. 89.]

District Court, N. D. Ohio. March, 1860.

SHIPPING — ASSIGNMENT — PURCHASE BY GOVERNMENT OF VESSEL SUBJECT TO LIENS—JURISDICTION UPON THE LAKES.

1. The assignment, by the builders of a vessel, of the moneys to become due on the building contract, invests the assignee with no such proprietary interest as will enable him to appear as claimant and defend.

2. The purchase by the government of a vessel for the revenue service does not divest the same of valid liens existing at the time the title was acquired. The government takes cum onere, and the liens may be enforced by the ordinary methods.

3. Admiralty and maritime jurisdiction possessed by the district courts of the United States on the Western lakes and rivers, under the constitution, and act of 1789 [1 Stat. 76], independ-

---

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

ent of the act of 1845 [5 Stat. 726], and unrestricted thereby.

[Cited in The Isabella, Case No. 7,100; The Volunteer, Id. 16,990.]

This was one of some thirty or more separate libels filed by these libellants and others against revenue cutters numbered (originally) one, two, three, four, five, six, built by Merry & Gay, ship-builders, at Milan, Ohio, under contract with the government, in 1858, and designed for service on the Western lakes. The libels were for materials furnished the builders for the construction of these vessels, and were founded upon liens acquired under the mechanic's lien law of Ohio. Pleas to the jurisdiction were interposed by the United States district attorney, Hon. Geo. W. Belden, in behalf of the government, and by Hon. R. P. Spalding, on behalf of Andrews & Otis, claiming, 1st, that these vessels, by a true construction of the contract between the builders and the government, belonged to the government ab initio, and that, if so, no lien attached, as liens could not be acquired against government property, and as in order to come within the provisions of the statute relied upon, the materials must have been furnished by virtue of a contract with the then owners of the vessel; and 2d, that the government having taken possession of the cutters before these proceedings were instituted, the liens, if any existed, were cut off, or at all events could not be enforced by seizure of public property; and cited The Lord Hobart, 2 Dod. 100, 451; [U. S. v. Barney, Case No. 14.525]; Ellison v. The Bellona [Case No. 4,407; Clinton v. The Hannah [Id. 2,898]; Nathan v. Virginia, 1 Dall. [1 U. S.] 77; 3 Brod. & B. 275; [Buchanan v. Alexander], 4 How. [45 U. S.] 20; [U. S. v. McLemore], Id. 286.

Willey & Carey, for libellants, reviewed the above cases, and claimed: 1st. That Andrews & Otis, having no proprietary interest in the vessels, but only in a portion of the contract price, by assignment from the builders, could have no such persona standi in judicio as would entitle them to be recognized as claimants. 2d. That the vessels continued to be the property of the builders until they were completed and delivered to the officers of the government, and by them accepted—that where anything remains to be done before the sale of personal property is complete, no title passes, citing Long, Sales, 267; Chit. Cont. 375–378; 2 Greenl. Ev. 528; 6 East, 614; 15 Johns. 349; 21 Pick. 384; Story, Cont. § 18; Story, Sales, § 296; 2 Kent, Comm. 496. 3d. That although the cases cited might establish the doctrine that liens could not be acquired against public property, yet that if such liens existed at the time the property was acquired by the government, they were not thereby divested or discharged, citing U. S. v. Wilder [Case No. 16,694]; [The St. Jago de Cuba], 9 Wheat. [22 U. S.] 409; Nathan v. Virginia, 1 Dall. [1 U. S.] 77 (argument of attorney general).

WILLSON, District Judge. This is a proceeding in rem, to recover the value of materials furnished by the libellants in the building of a vessel, which, at the time of its seizure in this suit, was owned by the United States, and in the use of the revenue service. The account, as it appears itemized in the schedule, accrued at various periods between the 22d day of November, 1856, and the 15th day of June, 1857. The materials were supplied to Merry & Gay, of Milan, who were contractors with the United States (through the secretary of the treasury) for the building of six revenue cutters for the revenue service of the government. The libellants claim the right to this proceeding in the admiralty by virtue of a lien acquired by them upon the vessel under the statute law of Ohio of March 11, 1843 [Laws Ohio 1843, p. 66], and the act amendatory thereto, passed March 12, 1853 [Laws Ohio 1853, p. 417]. The first parties who seek to be admitted upon the record to defend, as claimants, are Andrews & Otis. They were bankers at Milan, and (it is said) furnished Merry & Gay a large sum of money to aid in the construction of these vessels, taking, as security therefor, on the 1st of August, 1857, all Merry & Gay's demands and claim upon the government by virtue of said contract of building, and also any and all interest they might then have in the vessels. The second claimant is the government of the United States, which, by the district attorney, has filed its claim to the absolute ownership of the property, and has also answered, setting forth, among other things, that the vessel in question, at the time of its seizure by process in this suit, was a public armed vessel of the United States actually employed in the revenue service of the government; and it is insisted, in the answer filed by the district attorney, that the vessel, being so owned and employed, is exonerated and discharged from all liens of individuals which accrued during her construction, and is also exempt from seizure upon process in rem in the admiralty to enforce the lien thus acquired.

The first point we are called upon to consider is, whether Andrews & Otis have the kind of interest in the suit requisite to establish a "persona standi in judicio." It is not sufficient to entitle a party to intervene and defend, when it is simply shown that he has an interest in the question litigated. He must have rights in the vessel itself, that is, an ownership either general or special in the property, or such a claim as operates directly upon it by way of a lien, statutory or maritime. Hence, it is necessary to inquire into the sort of interest, if any, acquired by Andrews & Otis in the revenue cutter seized in this suit. And for this purpose we must examine some of the terms of the contract entered into by and between the United States and Merry & Gay for the construction of these vessels, and the subsequent assignments of the latter to the United States and to Andrews & Otis, with reference to the re-

spective dates and the purposes of those assignments. The contract for building the vessels bears date November 17, 1856. By its terms Merry & Gay were to construct, equip and deliver afloat to the United States six cutters of 50 tons burden each. They were to furnish the labor and materials for the building and equipment at their own expense; and it was further stipulated, that on each of said cutters being so far advanced as to be planked, ceiled and decks laid, the government should pay $2,025 to Merry & Gay, they executing an assignment of said vessels as a further security for said advances, and upon completion and delivery agreeably to the terms of the contract, a final payment of $2,025 for each, was to be made in full satisfaction. On the 25th day of April, 1857, Merry & Gay received from the United States $2,025, the first instalment provided for in said agreement, and thereupon executed and delivered to the government agent, for the benefit of the United States, a full and unconditional assignment and transfer of their interest in said cutter No. 1, which assignment was duly filed by said agent in the clerk's office of the township of Milan, but nevertheless was so received and filed as a mortgage security for the advance made. On the 8th of September, 1857, the said six revenue cutters having been fully finished and equipped by Merry & Gay (and who up to that time had retained exclusive possession and control of them), were delivered by the contractors to the government agent, and accepted by him in full satisfaction of the fulfilment of the contract to the government on the part of Merry & Gay. By an instrument of writing, bearing date August 1, 1857, Merry & Gay assigned and set over to Andrews & Otis all their interest in said cutters, and all claim to the second instalment due them from the United States, under the contract of 17th November, 1856, being the sum of $12,150; and on the 4th of September, 1857, a like assignment was made of a further claim against the United States of $14,000, being the amount allowed by the government to Merry & Gay for extra work and materials.

Upon this statement—the whole transaction in relation to the construction, title and incumbrances upon said cutter No. 1—it is as difficult for us to perceive any lien acquired by Andrews & Otis upon the vessel as it is to find in them any right of property to it. By the assignment of August 1, 1857, Andrews & Otis obtained no other lien than that possessed by Merry & Gay. It is not pretended that the latter ever acquired any lien by virtue of the local laws. Nor in my opinion, was any conferred by the general maritime law. The vessel was built at Milan, in the state of Ohio, which place, to all intents and purposes, was her home port. The United States could not, in any sense, be deemed a foreign contractor. And under the decision of the supreme court of the United States, in the case of People's Ferry

Co. v. Beers, 20 How. [61 U. S.] 393, pronounced at the December term, 1857, a contract for building a domestic ship, cannot be regarded as a maritime contract. The court, in that case, say "the contract is simply for building the hull of a ship and delivering it on the water. She was constructed and delivered according to contract. The admiralty jurisdiction is limited to contracts, claims, and services purely maritime, and touching rights and duties appertaining to commerce and navigation." And the court adopt the language of Judge Hopkinson, used in 1781, and declare, as respects shipbuilders, that "the practice of former times doth not justify the admiralty's taking cognizance of their suits." In that case the court advanced still further in restricting maritime liens upon what was declared to be without the jurisdiction of the admiralty in Pratt v. Reed, 19 How. [60 U. S.] 359. The case decided by the supreme court at the late December term, was simply one where a vessel owned in New Jersey was built in that state by the libellants, on credit. and without any express pledge of the vessel for the debt, and where no lien was provided or secured by the local law. And the court say in the opinion delivered, that "the question presented involves a contest between the state and federal governments. The latter has no power or jurisdiction beyond what the constitution confers. The contest here (say the court) is not so much between rival tribunals as between distinct sovereignties claiming to exercise power over contracts, property and personal franchises. What were meant in 1789 by 'cases of admiralty and maritime jurisdiction,' must be meant now. What was reserved to the states to be regulated by their own institutions, cannot be rightfully infringed by the general government, either through its legislative or judiciary department."

It is our purpose to dispose of questions of admiralty law in subordination to the judgments and decisions of the supreme court of the United States, how much soever those decisions may vary from the rules of law previously established by maritime courts upon the same subject. Under its decisions, and the principles of law enunciated by that court, the contract between Merry & Gay and the United States was not a maritime contract. Nor did the money advanced by Andrews & Otis, for the building of these revenue cutters, impose a maritime lien which attached to the vessels. It is clear, then, that Merry & Gay, having no lien by virtue of the contract for building, none was transferred by their assignment to Andrews & Otis. It is equally clear that the assignment to Andrews & Otis did not, nor was it intended to pass the legal title to the property. The purpose of the assignment was to transfer to the assignees the unpaid claim upon the government. It was the palpable intention to give the assignees

all the rights to the claim and the facilities for its collection that the assignors possessed. Merry & Gay retained the property, finished the construction of the vessels and exercised exclusive ownership over them, until they were delivered over to the government agent on the 8th of September, 1857. So far, then, as Andrews & Otis are concerned, they have neither a jus ad rem nor a jus in re, and consequently cannot be admitted upon the record as claimants to defend in this suit.

We proceed to the other branch of the case, and inquire, whether a vessel owned by the United States, and actually employed in the revenue service, is exonerated and discharged from all liens of individuals which accrued before the government obtained title, and whether it is consequently exempt from seizure upon process in rem in the admiralty to enforce such lien. It is not deemed necessary to discuss the point as to the time when the United States acquired title to this revenue cutter. We are satisfied, from an examination of the contract between the government and Merry & Gay, that the title was in the latter until the vessel was completed and delivered to the government agent in September, 1857, and received and accepted by him in fulfilment of the terms of the contract. Nor is it necessary to inquire into the character and effect of the assignment to the government of Merry & Gay's interest in the vessel, which was made on the 25th day of April, 1857. Nor do we understand it to be seriously controverted by counsel, that the libellants acquired a valid lien under the state law, while the vessel was owned and in the possession and control of the builders. We have, then, the naked proposition presented of the extinction of a valid lien upon a vessel by the acquisition of title to it by the government and its use in the revenue service. This is not a case of contract for supplies to the United States. The position taken by counsel in the argument, and the authorities cited by them, in support of it, that in contracts for supplies or repairs for government ships, no lien can be presumed to exist, does not reach the real question, the solution of which is decisive of this controversy. In that class of cases, Mr. Justice Story well remarked in U. S. v. Wilder [Case No. 16,694], "that there may be a just foundation for a distinction as to liens between the case of the government and that of a mere private person in many cases of contract. It may, perhaps, be justly inferred in many cases, from the nature of certain contracts, and employments and services of the government. that no lien attaches thereto. For example, it may be true that no lien exists for repairs of a public ship, or for materials furnished therefor, or for wages due to the crew thereof; or for work and labor performed upon the arms, artillery, camp equipage and other warlike

equipments of the government. In such cases the nature and use of the articles, as the means of military and naval operations may repel any notion of any lien whatever grounded upon the obvious intention of the parties." And the reason is, that when the contract is made with the government, the presumption of the law should be, that the credit was given solely to the government without any reliance, as a security, upon such implements of military and naval warfare. The argument ab inconvenienti has no force, except in that class of cases where the contract is made directly with the government, and where, from public policy, the materials are deemed to be supplied and the labor performed upon the credit of the nation, the reliance for payment resting solely upon its justice and good faith. But in relation to the rights of the government and the immunities of property purchased by it, whether real or personal, a very different rule of law obtains founded upon equally sound reasons. If property is obtained by purchase, the government acquires no better title than that possessed by its vendor. If the property is legally incumbered by mortgage or other liens, the transfer of title does not divest it of those incumbrances. In this respect the government stands upon the same footing as that of individuals. In controversies in courts of justice, involving the rights of property, it has no muniments of title sanctified by sovereignty which should exempt it from the rules of law governing individuals in like cases. No well considered case can be found anywhere, which declares that bare possession of property by the government when wrongfully obtained, of necessity changes the title and vests it in the sovereignty, or if justly obtained, that such possession extinguishes the lawful liens of individuals upon it. Such a doctrine would be monstrous, and an anomaly in a nation whose government is one of just laws, and whose constitution declares that "private property shall not be taken for public use without just compensation."

In the case at bar, there is no privity of contract between the libellants and the government of the United States. The transaction was with, and the credit given to, Merry & Gay, and security for the debt obtained by a lien upon the vessel under and by virtue of the law of the sovereign state of Ohio. The sovereignty which, by just and constitutional law, imposes and secures the lien, will recognize, and if need be, may by law enforce the remedy. This remedy, however, may be obtained by proceedings in a court of admiralty under the 12th rule prescribed by the supreme court of the United States, which rule provides "that in all suits by material-men for supplies or repairs or other necessaries for a foreign ship, or for a ship in a foreign port the libellant may proceed against the ship and freight in rem, or against the master or owner alone

in personam. And the like proceedings in rem shall apply in cases of domestic ships, where by the local law a lien is given to material-men for supplies, repairs or other necessaries." Entertaining these views, the exceptions of the libellants to the claim and answer of Andrews & Otis are sustained, and the exceptions of the United States to the libel are overruled.

This cause again came on to be heard on a further objection to the jurisdiction, and on the merits.

Belden & Spalding, for respondent, on the evidence, claiming:

1st. That credit was given to the builders, and not in any manner to the vessels.

2d. That the liens, if any attached, had been waived by the subsequent transactions of the parties.

And it was further claimed by Judge Belden that these vessels, not being "enrolled and licensed for the coasting trade," or "employed in business of commerce and navigation," &c., were not within the purview of the act of congress of February 26, 1845, and were therefore not the subjects of admiralty jurisdiction.

Willey & Cary, for libellants, insisted:

1st. That it is no objection that credit is given to several vessels collectively, and not to each separately, provided what actually entered into the construction of each can be afterwards ascertained. 7 Watts & S. 381; 13 Pa. St. 167; 17 Pa. St. 234; The Kiersage [Case No. 7,762]; 2 Ohio St. 114.

2d. That under the mechanic's lien law, no proof of credit being given to the structure is required. 18 Ohio, 202.

3d. Negotiable paper received, no payment or waiver of lien. Weed v. Snow [Case No. 17,347]; Allen v. King [Id. 226]; Moore v. Newbury [Id. 9,772]; The Chusan [Id. 2,-717]; The Active [Id. 34]; Fland. Shipp. 341, 374; The Eastern Star [Case No. 4,254]; The Betsy and Rhoda [Id. 1,366]. Giving credit no waiver. The Nestor [Case No. 10,126]; The Betsy and Rhoda [supra]. Must be clear evidence that lien waived. Moore v. Newbury [supra]; The Chusan [supra]; The Betsy and Rhoda [supra]. Always the presumption that new securities are taken merely as auxiliary. The Betsy and Rhoda [supra].

4th. That section 2 of article 3 of the constitution, confers admiralty jurisdiction upon the federal courts.

Section 9 of the judiciary act of 1789, assigns this jurisdiction to the district courts. The jurisdiction thus granted is without limitation, so far as ordinary seizures are concerned, for it will be found, on inspection, that the language which follows this grant of jurisdiction, and which refers to seizures made on waters navigable from the sea, &c., is limited to "seizures under laws of impost,

navigation or trade." The Magnolia, 20 How. [61 U. S.] 309, Mr. Justice Daniel. Hence, as no such limitations as are contained in the act of 1845 existed at the time the constitution was adopted, it follows that, under the constitution, as construed in [The Genesee Chief], 12 How. [53 U. S.] 443, and the act of 1789, general original admiralty and maritime jurisdiction was possessed by the district courts upon the lakes and rivers as well as upon the seaboard, before this act of 1845 was passed, and this without any limitation except as to "seizures under laws of imposts," &c. The whole question, then, is narrowed down to this: Is the act of 1845 to be treated as a restraining statute, or as merely cumulative to the act of 1789?—In other words, is an act passed for the purpose, as avowed in its title, of "extending the jurisdiction of the district courts," to be so construed as to limit and abridge the jurisdiction they already possessed? A later act cannot repeal or modify a prior one, except by express terms or necessary implication, and this implication must be founded upon a clear repugnancy of the later with the former statute. See authorities on the interpretation of statutes, collated in Curwen's Rev. Laws Ohio, 13, 17; 15 Ohio, 65; 3 Hill, 41; 15 Johns. 220; [Wood v. U. S.] 16 Pet. [41 U. S.] 362; [Daviess v. Fairbanks] 3 How. [44 U. S.] 646. Hence, the act of 1845 is to be treated merely as cumulative, and in fact superfluous, not as restrictive or abridging; and if so, the objection that these vessels were not enrolled and licensed, or engaged in commerce or navigation, is of no avail, because no such limitations exist in the statute of 1789, which, as we have seen, stands unaffected by the act of 1845.

WILLSON, District Judge. The most important matter for consideration in this case is involved in the question of the jurisdiction of the court over the vessel seized, as the record shows such vessel was not enrolled and licensed for the coasting trade, or engaged in the business of commerce and navigation between different states. This inquiry, more properly, should have been disposed of at the inception of proceedings in the cause, but its great practical importance has induced us to reserve the point for decision till the final hearing. The question of jurisdiction arises upon the construction of the ninth section of the judiciary act of 1789 (1 Stat. 76), and the legal effect to be given to the act of February 26, 1845 (5 Stat. 726). It is claimed by the counsel for the respondent that this vessel, not being enrolled and licensed for the coasting trade, or employed in business of commerce or navigation, &c., was not within the purview of the act of 1845, and, consequently, was not subject to admiralty process in rem in the district court of the United States.

The consideration of this branch of the case demands a careful examination of the con-

stitution of the United States and the acts of congress by which admiralty jurisdiction is conferred upon the federal courts. Section 2, in article 3 of the constitution, declares that the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction. The ninth section of the judiciary act of 1789 provides that "the district courts shall have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation, or trade of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas." In the case of Jackson v. The Magnolia, 20 How. [61 U. S.] 298, Mr. Justice Grier, in delivering the opinion of the court, says that "before the adoption of the present constitution, each state, in the exercise of its sovereign power, had its own court of admiralty, having jurisdiction over the harbors, creeks, inlets, and public navigable waters connected with the sea. This jurisdiction was exercised not only over rivers, creeks and inlets which were boundaries to or passed through other states, but also when they were wholly within the state. Such a distinction was unknown. Nor had these courts been driven from the exercise of jurisdiction over torts committed on navigable water within the body of a county, by the jealousy of the common law courts. When, therefore, the exercise of admiralty and maritime jurisdiction over its public rivers, ports and havens was surrendered by each state to the government of the United States, without an exception as to subjects or places, this court cannot interpolate into the constitution, or introduce an arbitrary distinction which has no foundation in reason or precedent." It had been previously held by the same high authority ([The Genesee Chief], 12 How. [53 U. S.] 454) that "there is nothing in the ebb and flow of the tide that makes the water peculiarly suitable for admiralty jurisdiction, nor anything in the absence of a tide that renders it unfit. If it is public navigable water, on which commerce is carried on between different states or nations, the reason for the jurisdiction is precisely the same. And if a distinction is made on that account, it is merely arbitrary, without any foundation in reason." The chief justice, in the case of The Genesee Chief [supra], with a just and comprehensive view of the rights and necessities of the people in the states bordering upon the lakes, declares that: "Courts of admiralty have been found necessary in all commercial countries, not only for the safety and convenience of commerce and a speedy decision of controversies where delay would often be ruin, but also to administer the laws of nations in a season of war, and to determine the validity of captures, and questions of prize or no prize in a judicial proceeding. And it would

be contrary to the first principles on which the union was formed, to confine these rights to the states bordering on the Atlantic and to tide-water rivers connected with it, and deny them to the citizens who border on the lakes and the great navigable streams which flow through the Western states. Certainly such was not the intention of the framers of the constitution; and if such be the construction finally given to it, by this court, it must necessarily produce great public inconvenience, and at the same time fail to accomplish one of the great objects of the framers of the constitution—that is, perfect equality in the rights and privileges of the citizens of the different states, not only in the laws of the general government, but in the mode of administering them." This exposition by the supreme court, of the power given in the constitution to the general government over all cases of admiralty and maritime jurisdiction, is conclusive that congress has authority to confer this jurisdiction upon the federal courts, to the full extent of power possessed by the judges of the vice admiralty courts in this country under the colonial system, and the state admiralty courts under the confederation; and that this jurisdiction is not affected by the restraining statutes of Richard II. and Henry IV. of England.

The next inquiry is, whether congress, in framing the ninth section of the judiciary act, failed to carry out this great purpose of equality in the laws of the United States, and the mode of administering them in all the states of the Union, without any exception as to the subjects and places. The first clause of the section quoted provides that "the district courts shall have exclusive original cognizance of all civil cases of admiralty and maritime jurisdiction." This provision is complete in itself, and invests the district courts with absolute admiralty and maritime jurisdiction, without any restriction as to the powers conferred, or any limitation as to the subjects and places for the exercise of those powers. And unless the succeeding clause in this ninth section was intended to restrict the former, then there can be no doubt of the authority of the district courts to exercise, by virtue of the statute, admiralty jurisdiction over vessels upon the waters of the great lakes. We again quote the language of the succeeding clause, to wit: "including all seizures under laws of impost, navigation or trade of the United States, when the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas." The statute, by words of well defined meaning, in the first clause confers upon the district courts admiralty and maritime jurisdiction. In the second clause it confers upon the district courts jurisdiction of a class of common law cases, over which courts of admiralty had never before taken cognizance. In England, seizures

under the laws of imposts were peculiarly cognizable in the court of exchequer under the authority and process of the common law. Cases of forfeiture for breaches of the revenue laws were cognizable in the exchequer upon information, though seizure was made upon navigable waters; and the question of fact, on which the forfeiture arose, was always tried by a jury. And such also was the course of procedure in the exchequer for the violation of the navigation laws. In the case of Attorney General v. Jackson, Bunb. 236, the seizure was of a vessel for the breach of the "act of navigation," and the proceeding was by information and trial by jury, according to the course of the common law. Congress, in the exercise of its authority, under the constitution, to establish the federal courts, did not see fit to create a court of exchequer. It established the supreme, circuit, and district courts, and defined their powers. It was competent to give to either of them the administration of the laws relating to imposts, navigation and trade. It was given to the district courts, to be exercised within their respective districts, when seizures should be made on waters which are navigable from the sea by vessels of ten or more tons burden. This authority and its limitation had reference to the exigencies of the foreign trade of the country, and to the enforcement of revenue laws relating to imposts. It was doubtless supposed that vessels employed in the foreign trade and navigating the ocean would exceed ten tons burden, and that in carrying on the commercial operations of the country, such vessels would enter the rivers, inlets and bays whose waters are navigable from the sea. The giving to the district courts cognizance over this class of common law cases was not essential, nor was it intended to give strength to the admiralty powers previously conferred. The jurisdiction of the court over one class of cases has no necessary connection with the jurisdiction over the other. And hence, by no rule of construction, can the limitation of the jurisdiction of the court over seizures, under laws of imposts, made upon waters navigable from the sea, be held to limit the jurisdiction of the court in the exercise of its powers in admiralty and maritime cases. A contrary rule of construction would make the statute an instrument of injustice, and defeat the great purpose of the constitution, as interpreted by the supreme court of the United States. We hold, then, that by virtue of the ninth section of the judiciary act of 1789, the district courts of the United States have precisely the same admiralty jurisdiction upon the great lakes as upon the navigable waters of the seaboard; and that the maritime law has the same application to cases upon these inland seas, as it has to those on tide waters.

We now proceed to examine and consider the operation and legal effect of the act of February 26, 1845. This law provides that "the district courts of the United States shall have, possess, and exercise the same jurisdiction in matters of contract and tort, arising in, upon, or concerning steamboats and other vessels of twenty tons burden and upwards, enrolled and licensed for the coasting trade, and at the time employed in business, of commerce and navigation between ports and places in different states and territories upon the lakes and navigable waters connecting said lakes, as is now possessed and exercised by the said courts in cases of the like steamboats and other vessels employed in navigation and commerce upon the high seas, or tide waters, within the admiralty and maritime jurisdiction of the United States; and in all suits brought in such courts in all such matters of contract or tort, the remedies and the forms of process, and the modes of proceeding shall be the same as are or may be used by such courts in cases of admiralty and maritime jurisdiction; and the maritime law of the United States, so far as the same is or may be applicable thereto, shall constitute the rule of decision in such suits, in the same manner, and to the same extent, and with the same equities as it now does in cases of admiralty and maritime jurisdiction; saving, however, to parties, the right of trial by jury of all facts put in issue in such suits, where either party shall require it; and saving also to the parties the right of a concurrent remedy at the common law, when it is competent to give it, and any concurrent remedy which may be given by the state laws, where such steamer or other vessel is employed in such business of commerce and navigation." The circumstances, and the apparent necessity which induced congress to enact this law, are well understood by the profession in the states, bordering upon the great lakes. Previous to the year 1845, the supreme court of the United States had, by a uniform course of decision, adopted the theory of the English courts, of limiting the jurisdiction of the admiralty to waters subject to the ebb and flow of the tide. In the case of the Thomas Jefferson, 10 Wheat. [23 U. S.] 428, decided in 1825, it was held that the admiralty had no jurisdiction over contracts for the hire of seamen, except in cases where the service was performed upon the sea, or upon waters within the ebb and flow of the tide. This was a leading case, and the opinion of the court was pronounced by Mr. Justice Story, who was pre-eminent for his learning, and whose expositions of constitutional and maritime law have ever commanded respect at home and abroad. But this learned jurist evidently saw and felt the injustice of the rule of law established in that case; for he there put the quære whether, under the power to regulate commerce, congress might not extend the remedy, by the summary process of the admiralty, to the case of voyages on the Western waters. And, in the opinion delivered, he gave the significant suggestion (since acted on by congress) that "if the public inconvenience from the want of process of

an analogous nature shall be extensively felt, the attention of the legislature will doubtless be drawn to the subject." The same doctrine of limiting the admiralty jurisdiction to tide water, was again affirmed in 1837, by the same court, in case of The Orleans v. Phœbus, 11 Pet. [36 U. S.] 175.

This continued and apparently settled interpretation of the constitution by the highest judicial tribunal of the country, and its palpable injustice to those connected with the great commercial marine of the lakes, left to congress no other alternative than to profit by the suggestion of the court, intimated in the case of the Thomas Jefferson, and if possible by legislation, to mitigate the evil and soften the injustice resulting from the doctrine of those cases. It was this condition of things that brought about the passage of the act of February 26, 1845. The law is entitled "An act to extend the jurisdiction of the district courts to certain cases upon the lakes and navigable water connecting the same." The act, neither in its title or its body, purports to confer upon the district courts admiralty and maritime jurisdiction; nor was such the purpose of its framers. It authorizes quasi admiralty proceedings in certain cases, it is true. But it is clear that congress did not look to the second section of the third article of the constitution for its authority to pass the act, for, at that time, it was well settled by the judgment of the supreme court, that this second section did not invest the government of the United States with any power to confer upon the federal courts admiralty jurisdiction over waters not affected by the tide. It is equally clear that in passing the act, congress looked for its authority solely to the eighth section of the first article of the constitution, which declares that "congress shall have power to regulate commerce with foreign nations and among the several states." Under this provision it had been repeatedly held that congress has power to legislate over navigation as well as trade; that it has power to prescribe what shall constitute American vessels and the national character of the seamen who shall navigate them; and also to prescribe rules and regulations for the intercourse and navigation of such vessels between the different states and territories. But the act of 1845 does not repeal or otherwise abrogate the ninth section of the law of 1789, or any part of it. At most, it can only be regarded as affording remedies which are cumulative upon former laws. It designates a class of vessels of twenty tons burden and upwards that are enrolled and licensed for the coasting trade, and at the time employed in business of commerce and navigation between ports and places in different states and territories upon the lakes. It makes no provision in relation to vessels engaged in the foreign trade; nor does it embrace remedies upon a large variety of maritime contracts, having no connection with the navigation and trade between different states. We know of no rule of construction by which the act of 1845 should be held to have the effect of repealing any portion of the ninth section of the judiciary act, or to abridge any of the admiralty powers conferred upon the district courts by the statute of 1789. Its purpose, as avowed in its title, is "to extend the jurisdiction of the district courts;" and it certainly cannot be so construed as to limit and abridge an existing jurisdiction. This interpretation and construction of the act of 1845, as to its effect upon previous legislation, is amply sustained by authority. When a statute gives a new remedy without impairing or denying one already known to the law, the rule is to consider it as cumulative, allowing either the new or the old remedy to be pursued. 15 Ohio, 65; 15 Johns. 222.

To repeal a statute by implication, it is not sufficient to establish that subsequent laws cover some or even all the cases provided for by the prior law, for they may be merely affirmative, or cumulative, or auxiliary. But there must be a positive repugnancy; and even then the old law is repealed only pro tanto to the extent of the repugnancy. [Wood v. U. S.] 16 Pet. [41 U. S.] 362; [Daviess v. Fairbank], 3 How. [44 U. S.] 646. There is no repugnancy between the acts of 1789 and 1845. Under the former law, the district courts have jurisdiction of vessels under twenty tons burden, whether enrolled and licensed or not, and also of vessels employed in the foreign trade. And they have jurisdiction of those exceeding twenty tons burden that are enrolled and licensed, and engaged in navigation between different states, not only by virtue and under the authority of the act of 1789, but also by the act of 1845; and yet the right of the trial of facts put in issue to a jury, is secured in all cases. This we believe to be the true import and legal effect of the two acts of congress, when considered and construed together. We do not intend or desire to enter upon a discussion of the constitutional power of congress to pass, and to make either of these laws operative upon the great lakes. Nor is it for us to sit in judgment upon the merits of the controversy which, for many years, has engaged the members of the supreme court of the United States, upon the question of limiting the admiralty jurisdiction of the federal courts to tide waters. That controversy has been distinguished for great ability and profound learning. It has been attended with all the sensitiveness (and yet without any of the arrogance or acrimony), which characterized the struggle for jurisdiction in England, between the courts of common law and those of the admiralty and chancery, in the early part of the seventeenth century. We are well satisfied with the interpretation of the constitution, as to the extent of the admiralty powers possessed by the general government, which is now established by the mature judg-

ment of the supreme court of the United States; and it is enough to know that the cases of The Thomas Jefferson [10 Wheat. (23 U. S.) 428], and The Orleans v. Phœbus, 11 Pet. [36 U. S. 175], are overruled cases, and that the doctrine maintained by the supreme court in the cases of The Genesee Chief and The Magnolia, furnishes a rule of decision which is of paramount authority in all the courts of the United States.

On the whole, we are of the opinion that the admiralty jurisdiction of this court is rightfully exercised over the vessel seized in this case, and that it is no valid objection to the jurisdiction, that the vessel, at the time of seizure, was not enrolled and licensed for the coasting trade, or engaged in the business of commerce and navigation between different states or territories. Decree for libellant.